Francis E. SPENCER, doing business as Spencer Electric Renewal Parts, Appellant,

v.

GENERAL ELECTRIC COMPANY, formerly General Electric Distributing Corporation, formerly General Electric Supply Company, Appellee.

No. 15624.

United States Court of Appeals Eighth Circuit.

April 25, 1957.

Rehearing Denied May 31, 1957.

Kaer P. Vanice, II, and O. C. Phillips, Kansas City, Mo. (Edwin Earnshaw and Kirchner & Vanice, Kansas City, Mo., on the brief), for appellant.

John C. Thurlo, Kansas City, Mo. (Roy P. Swanson and Blackmar, Swanson, Midgley, Jones & Eager, Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

Appellant sought to recover from appellee, on a written contract, a balance of commissions alleged to be due him as a field salesman, for the period from January 1, 1951, to March 1, 1952.[1] The court, on a jury-waived trial, denied recovery, and he has appealed.

The suit is one resting on diversity jurisdiction and controlled by Missouri law.

Appellee operated a wholesale electric-supply business at Kansas City, Missouri. It engaged appellant as a salesman, under a written contract, and assigned to him certain of its Missouri customers or accounts, among which was Northwest Power Co-op, of Cameron, Missouri.

---

[1] Appellee originally instituted an action against appellant for the price of merchandise which appellant had purchased for a retail electric shop operated by him. Appellant filed a counterclaim for commissions alleged to be due him from his previous employment by appellee. Only the court's action on the counterclaim is before us.

The controversy here is over commissions on this particular account.

The contract (denominated in the instrument as "The Plan") provided generally for a commission rate of 14 per cent in appellant's favor on the amount of appellee's "gross margin" [2] from sales of the kind of supplies purchased by Co-op, with the commissions as computed to be credited to the account of appellant during the contract's 12-month term, "until the aggregate amount of commission credit given to him [on all his assigned accounts] equals $7,000", and with an allowance to be made on all gross margin thereafter, "at a rate to be determined by the Manager [of appellee] in his sole discretion at the end of the period covered by the Plan".

There also was a general provision that "the salary, drawing account or other compensation (other than prize awards and push commissions) received by the Salesman for the period on which such credits were computed" would be deducted from his total commission credit.

The general provisions as to employment term, gross margin and commission rate, were, however, all made subject to the operation of certain special conditions and powers in favor of appellee, set out in the instrument and termed "Rules".

Thus, Rule 9 provided that "The Corporation shall have the right in its absolute discretion from time to time to change the basic commission rate * * * of the Plan; to change the assignment of accounts to the Salesman in whole or in part; *and to credit the Salesman only with such portion of the Corporation's Gross Margin on any assigned account, as it in its judgment deems fair and equitable*." (Emphasis ours.)

Rule 8 provided that "The Salesman will not in any event be entitled to any compensation other than his salary or drawing account, in respect to orders procured by him or otherwise received by the Corporation during his employment under the Plan, which shall not have resulted in a sale by the Corporation pursuant to Rule 3, within the period this Plan shall be in effect as to the Salesman".

Rule 3 provided that "A commodity will be considered to have been sold when it is shipped or delivered to the purchaser irrespective of when the order therefor shall have been received or payment therefor shall have been made".

Rule 7 provided that "The Corporation may in its absolute discretion dismiss, discharge or lay off the Salesman or assign him to other duties at any time, with or without cause, and if any such is done, or if the Salesman's employment hereunder is otherwise terminated, prior to the end of the calendar year specified in the Plan, the Salesman will not be entitled to any compensation hereunder, except as provided in Rule 1".

Rule 1, in substance, provided that in case of the termination, under certain conditions, of the employment of the Salesman prior to the end of the calendar year specified in the Plan, his commission rate, "shall be reduced by that percentage which the length of time the Salesman was not employed by the Corporation in the period specified in the Plan is of the period specified in the Plan".

The term of the employment generally, as fixed by the contract, was for a year—from January 1, 1951, to December 31, 1951, inclusive. There was no provision as to renewal or extension, but appellant continued in appellee's employ until March 1, 1952, when appellee terminated the relationship. Notice of the intended termination had been given appellant on February 15, 1952.

According to the evidence, appellant had made 10 routine field calls on Co-op during 1951. Co-op was during this period on the point of making some large special purchases, to be delivered in the latter part of 1951 and through 1952.

2. The contract contained a definition of "gross margin" and set out the elements which appellee was entitled to deduct in arriving at it.

The testimony of appellee's District Manager was to the effect that he personally negotiated the contracts with Co-op for these special purchases and appellant "had nothing to do with getting that business". There was no evidence on behalf of appellant to the contrary. In fact, in a letter written by appellant to appellee, after his employment was terminated, he frankly characterized these special purchases on the part of Co-op as a "windfall" which had occurred—"one of those once-in-a-lifetime affairs".

The total of the special orders thus placed by Co-op with appellee, up to March 1, 1952, amounted to $923,311.66. The major part of these supplies were to have and were given delivery dates after March 1, 1952. Under Rule 3 of the contract, appellant's right to a commission credit on any order would not accrue until after shipment or delivery had been made to the purchaser. And under Rule 8, if shipment or delivery did not occur during his employment term, appellant was entitled, "in respect to orders procured by him or otherwise received by the Corporation during his employment", to compensation only in the amount of the salary or drawing account which had been paid him, plus (we take it, and as appellee here recognized) any balance of commissions over this amount which might, or by the terms of the contract should, have been credited to his account as of that time.

Appellant had been paid between $5400 and $5500 in drawing account and commissions during 1951, in relation to all the customers or accounts which had been assigned to him. At the time of his severance, checks were issued to him for additional commissions or balances due him, in the amount of $1938.38.

Appellee had, however, as of November 1, 1951, made a reduction in the amount of the gross margin from purchases by Co-op, on which appellant's commission should thereafter be computed, to 25 per cent. It accordingly credited appellant with a 14 per cent commission on only one-fourth, instead of on the full, gross margin from the sales (as defined in Rule 3) made by it to Co-op between November 1, 1951, and March 1, 1952. On the purchases of his other assigned customers, the full gross margin was used in computing his commissions.

Had appellant been credited with commission on the full gross margin from the sales made to Co-op up to March 1, 1952, he would have been entitled to $1256.31 more than he was paid. And a 14 per cent allowance on the full gross margin from the sales subsequently made by appellee, under the orders which Co-op had placed before the termination of appellant's employment, would have amounted to an additional $6,008.14.

Appellant claimed that appellee had no right legally to reduce the gross margin from Co-op's purchases, as a basis for computing his commissions, and hence the additional sum of $1,256.31 as referred to above, was due him on the sales made to March 1, 1952; that his discharge on March 1, 1952, was in breach of the contract and had wrongfully operated to deprive him of his commission, in the sum of $6,008.14, as referred to above, on sales thereafter made to Co-op under the orders placed by it prior to the termination of his employment; and that he was accordingly entitled to recover a balance of commissions on Co-op's purchases, in the total of these two sums, or $7,264.45. (Appellant's pleading had claimed a larger amount of commissions, but these were the figures established by the evidence.)

 As to appellee's right to reduce the applicable amount of gross margin from purchases made by Co-op, for purposes of appellant's commission credit, the provision of Rule 9 has previously been quoted, that "The Corporation shall have the right in its absolute discretion from time to time * * * to credit the Salesman only with such portion of the Corporation's Gross Margin on any

assigned account, as it in its judgment deems fair and equitable".

The trial court regarded such a provision for compensation control by an employer in an employment contract as not being in itself either unlawful or contrary to public policy under Missouri law. Appellant has not demonstrated, nor can we say as a matter of persuasion otherwise, that this appraisal of local law was erroneous.

To the contrary, we have heretofore recognized and enforced, as a matter of Missouri law, a provision in an agent's contract of representation allowing the principal to change the schedules of commission contained in the contract, "without advance notice * * * or to alter them if necessary to meet any unusual conditions not specifically covered". Walter Kidde & Co. v. Walton-Viking Co., 8 Cir., 153 F.2d 988, 990, 992. Moreover, the Supreme Court of Missouri has said generally that a contract is not without enforceability merely because it leaves to one of the parties the option to fix and alter details, if it does not confer the right to exercise the option arbitrarily. Spitcaufsky v. State Highway Commission of Missouri, 349 Mo. 117, 159 S.W.2d 647.

Here, as noted, the contract gave appellee the right to make at any time such change in the amount of the gross margin on any assigned account, for purposes of appellant's commission-allowance, "as it in its judgment deems fair and equitable". The unanticipated special purchases which Co-op made, the part which the District Manager had played in obtaining them, and appellant's lack of direct contribution in their production would normally impress as constituting a sufficient basis for good-faith judgment on the part of appellee, that it would not be acting unfairly in exercising its contract power in the circumstances, to reduce the amount of the gross margin on which appellant's commission should be currently computed in relation to Co-op's account. In addition to the factors which have been mentioned, there could be involved in such an exercise of judgment the consideration also of a possible dislocation between appellant's compensation and that of the other salesmen in relation to an individual account.

We think that the trial court therefore was entitled to hold that appellee had not acted arbitrarily or with bad faith in determining to reduce the amount of the gross margin from Co-op's account on which appellant's commissions should be computed. And as to the amount of the reduction made, we equally would be required to declare on the evidence that the trial court was warranted in holding that the result was not in fact an unfair or inequitable exercise of judgment on the part of appellee.

■■■ On appellant's next contention, that his discharge itself constituted a breach of the contract, the argument made is that the original contract had a fixed and solid term of one year; that the continuation by the parties of his employment thereafter, without any new agreement between them, operated to renew the contract for the term of another year; and that his discharge by appellee on March 1, 1952, was therefore wrongful and improper.

Under Missouri law, where parties have entered into a contract of employment or agency relationship for a term of a year, and the relationship is continued beyond that time, with no new agreement between them, there is a presumption that they have renewed the original contract for another year. Morris v. Z. T. Briggs Photographic Supply Co., 192 Mo.App. 145, 179 S.W. 783, 785; Williams v. John T. Hesser Coal Co., 207 Mo.App. 197, 231 S.W. 680.

This presumption of renewal would not, however, help appellant here. While the contract provided for a general term of a year, this specification would not be of significance, unless it could be said, on the instrument as a whole, that continuance of the employment status for that period had been made a firm right or obligation between the parties. Here,

as previously noted, Rule 7, expressly provided, as one of the conditions of the employment, that "The Corporation may in its absolute discretion dismiss, discharge or lay off the Salesman * * * at any time with or without cause * * *". And there was no language which undertook to prevent appellant from exercising the equal reciprocal privilege of quitting at any time. Thus, the parties manifestly intended to leave the way open to each of them to terminate the relationship at any time, if either of them chose to do so. This privilege of termination also would carry over into any renewal or extension of the operation of the agreement, since, without any modification having been made, such renewal or extension necessarily would be subject to all the terms of the original agreement.

It should be observed further that the facts of the situation also leave it outside the rule enunciated in Glover v. Henderson, 120 Mo. 367, 25 S.W. 175, 177, and Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, 629, that, "where an agent is employed to perform an act which involves expenditure of labor and money before it is possible to accomplish the desired object, after the agent has in good faith incurred expense and expended time and labor, but before he has had a reasonable opportunity to avail himself of the results of this preliminary effort, it could not be permitted that the principal should then terminate the agency, and take advantage of the agent's services, without rendering any compensation".

On the circumstances of Co-op's special orders and appellant's relationship to them, and in the light of the drawing account and commissions paid appellant for his general services, the situation cannot be declared by us to be one where the principal had attempted "to take the benefits of the agent's services without paying for them", Restatement, Agency, § 454, and where he ought therefore equitably to be made to respond in restitution.

The facts as to the drawing account and the commissions paid appellant and the trial court's appraisal that on the contract and the evidence his services had not been "terminated arbitrarily, or for the purpose of avoiding any obligation or liability under the terms of his contract", leave no room for any declaration on our part as a matter of law that appellant had in the situation been improperly or unfairly deprived of the commissions which he seeks to recover.

Beyond the circumstances of the special orders and the District Manager's part in obtaining them, there also was testimony, which the trial court was entitled to consider in its evaluation of the entire situation, that appellant's services had for some time not been fully satisfactory to appellee and had been made the subject of complaint to him on a number of occasions during 1951, in that appellee felt that he was devoting too much of his time to small customers and was not developing the potentiality of his larger accounts.

Appellant has made the general contention that the special conditions or powers provided for in the contract caused it to be unilateral in nature and so to be unenforceable for want of mutuality. That contention, however, does not call for any consideration. Unilateralness or want of mutuality, if it exists, is available only to escape such executory performance as may be remaining under the agreement or relationship. To whatever extent performance of the relationship under a unilateral agreement has been engaged in and is completed, it is legally subject, under Missouri law, as well as generally, to all the terms and provisions which the agreement has made applicable to it, except, of course, such as in themselves may be void for uncertainty, be illegal or be otherwise contrary to public policy. Weiss v. Duro Chrome Corp., 8 Cir., 207 F.2d 298, 300; Pulitzer Pub. Co. v. Chitwood, Mo.App., 9 S.W.2d 251, 252; Martin v. Ray County Coal Co., 288 Mo. 241, 232 S.W. 149.

It is argued that it was in any event unfair and improper for appellee to have undertaken to change the amount of the gross margin used in computing appellant's commission allowance on Co-op's purchases, without previous notice to him of such an intention. Appellant claimed that he was not informed of the change which had been made, until the termination of his employment. Appellee's evidence was to the effect that written notice of the change had been placed and left in appellant's office box at the time that it was made, in November, 1951.

The trial court regarded it as unnecessary to determine whether or not appellant did in fact have knowledge of the change at the time that it was made, in November, 1951. The contract contained no provision requiring the giving of previous notice, and the court was of the view that, since the power to adjust the gross margin was exercisable by appellee "as it in its judgment deems fair and equitable", no intention was required to be implied that such a notice should be given.

Moreover, the court felt that appellant could not legally be said to have suffered a detriment in the situation from any lack of notice, because in all events the critical question would be whether appellee had acted arbitrarily in making the reduction or had acted in the exercise of judgment which it could reasonably deem to be fair and equitable in the circumstances.

We cannot say that the appraisals made by the trial court, as determinations and applications of Missouri law, were clearly erroneous, within the rule and standard, which we have so frequently laid down as not to require citation here, relating to reversals on matters of local law.

The conclusion reached on the questions discussed is controlling of the result here, so that there is no need to consider the other matters argued by the parties.

Affirmed.